******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* BOBBY GRIFFIN
## (SC 20439)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of the crimes of murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. Several days after the shooting, a confidential informant told a detective, P, about a conversation he had with the defendant in which the defendant admitted to murdering the victim and wanting to sell the rifle that he had used to do so. At P's urging, the informant went to the defendant's residence to place a hold on the rifle. During the ride back to the police station, the informant told P that he saw a rifle and ammunition in the defendant's bedroom. P immediately began preparing an application for a search warrant while the police surveilled the defendant's residence. The police became concerned that their presence had been noticed and entered the defendant's residence in order to secure it until the warrant was obtained. During a protective sweep, an officer entered the defendant's attic and saw the rifle in plain view. The search warrant application was then approved on the basis of P's affidavit, in which P averred, inter alia, that the police were relying on an informant whose "information has been proven true and reliable." Thereafter, the defendant was detained and, in the early morning, brought to the station, where he waived his *Miranda* rights. He was then interviewed by two detectives, N and Z, for more than three hours, during which he confessed to the murder. Prior to trial, the defendant filed motions to suppress the rifle and other evidence discovered during the search of his residence and the statements he had made to N and Z during the interrogation. Specifically, he claimed that the rifle was illegally obtained during a warrantless search and that his confession was involuntary as a result of certain coercive interrogation tactics employed by N and Z, namely, interviewing him while he was sleep-deprived, presenting him with false evidence of his guilt, maximizing the consequences of not confessing, threatening his family with arrest, and suggesting that his confession would be met with leniency. The trial court denied both motions, concluding, inter alia, that the defendant's confession was voluntary. With respect to the rifle, the court concluded that exigent circumstances justified the warrantless entry into the defendant's residence and that, even if the entry into the attic was not permitted as part of the protective sweep, the rifle was admissible under the independent source doctrine on the ground that the search warrant that was issued was supported by probable cause independent of any information obtained during the initial entry. *Held*:

1. The defendant could not prevail on his claim that the trial court had improperly denied his motion to suppress the evidence found during the warrantless search of his residence, because, regardless of whether the initial entry and protective sweep were justified by exigent circumstances, the trial court correctly determined that the evidence was admissible pursuant to the independent source doctrine, as that evidence would have been lawfully and inevitably discovered pursuant to the search warrant: the defendant conceded, and this court agreed, that the decision to seek the search warrant, which P was preparing before the initial entry took place, was not prompted by information obtained during the initial entry and protective sweep, and P's affidavit in support of the search warrant, excised of any potentially tainted information from the initial entry, established probable cause to search the defendant's residence; moreover, although P's affidavit did not disclose any details to substantiate his averment that the informant's information had been "proven true and reliable," other aspects of the affidavit established the informant's reliability, as the affidavit made clear that the informant's identity was known to the police, stated that the informant

would be willing to testify in court in the future, indicated that P independently corroborated certain information provided by the informant, including the caliber of the firearm used in the shooting, and noted that the information the informant provided to P was based on the informant's firsthand observations while at the defendant's residence.

2. There was no merit to the defendant's claim that the trial court had improperly admitted his statements to N and Z on the ground that those statements were not voluntary and that their admission therefore violated his due process rights under the federal and state constitutions:

a. The trial court correctly determined that the state met its burden under the federal constitution of establishing the voluntariness of the defendant's statements by a preponderance of the evidence, as the record demonstrated that the combined effect of the interrogation tactics employed by N and Z did not cause the defendant's will to be overborne: although N and Z engaged in false evidence ploys by referring to evidence they did not have in order to give the impression that the state's case against the defendant was stronger than it actually was, most of the false evidence claims, viewed in light of the totality of the circumstances, were made during the first hour of the interview and were not particularly egregious, and the defendant demonstrated that he was capable of resisting and pushing back on these claims by falsely accusing another individual, Q, of the murder for more than two hours; moreover, the detectives' statements regarding the defendant's sentencing exposure were an accurate representation of the severity of the consequences that he faced, and, although N inappropriately referred to the death penalty during the interrogation, that was a single, isolated statement, the defendant had no audible reaction to it, and he continued to blame the murder on Q; furthermore, N's comment suggesting that members of the defendant's family would be arrested if he did not confess was not causally related to the confession of the defendant, who apparently recognized the threat as an empty ploy, and certain comments made by the detectives suggesting that the defendant would receive leniency if he confessed and that he could be charged with the lesser crime of manslaughter depending on the statement he gave were not inherently coercive, as N and Z did not make any definitive promise to the defendant or represent that they had the authority to determine the charges against him; in addition, the length of the interrogation was far shorter than other interrogations held not to have been inherently coercive, N and Z never subjected the defendant to physical abuse or threats of such abuse, the defendant twice waived his *Miranda* rights, and, although the defendant showed signs of being tired during the interrogation, he was lucid and responsive throughout the interview, was able to understand the detectives' questions, communicated clearly and coherently, and pushed back on certain of the interrogation tactics by consistently denying his involvement in the murder, fabricating and maintaining the story that Q committed the murder, and pretending to cry to give credibility to his story.

b. Applying the factors set forth in *State* v. *Geisler* (222 Conn. 672), this court declined the defendant's request to adopt a prophylactic rule under the state constitution requiring Connecticut trial courts to consider whether coercive interrogation tactics, such as those employed in the present case, raise questions about the voluntariness of a confession: the text of the state due process clause did not support the defendant's claim, the defendant did not cite to any federal or Connecticut authority in support of his claim that the state due process clause requires a more stringent analysis regarding the admission of confessions, the only case from another state cited by the defendant was distinguishable, and the defendant did not refer to any evidence that the authors of our state constitution intended to provide greater protection against involuntary confessions; moreover, public policy did not support adopting the prophylactic rule urged by the defendant, as courts already are required to consider the coercive nature of an interrogation under the totality of the circumstances, and defendants are capable of vindicating such concerns by introducing social science evidence or expert testimony to demonstrate that the interrogation tactics employed by interrogators overbore an individual's will.

(*One justice concurring separately*; *one justice concurring in part and dissenting in part*)

Argued June 1, 2020—officially released July 22, 2021\*

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven, where the court, *Vitale, J.*, denied the defendant's motions to suppress certain evidence; thereafter, the first four counts were tried to the jury before *Vitale, J.*; verdict of guilty; subsequently, the charge of criminal possession of a firearm was tried to the court; finding of guilty; thereafter, the court vacated the felony murder conviction and rendered judgment of guilty of murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *John P. Doyle, Jr.*, executive assistant state's attorney, and *Sean P. McGuinness*, assistant state's attorney, for the appellee (state).

*Maura Barry Grinalds* and *Darcy McGraw* filed a brief for the Connecticut Innocence Project et al. as amici curiae.

*Opinion*

MULLINS, J. On October 14, 2013, the victim, Nathaniel Bradley, was fatally shot by someone who was attempting to rob him. After receiving a tip from a confidential informant, the police focused their investigation on the defendant, Bobby Griffin. The police discovered the rifle used in the murder hidden in the attic of the defendant's residence. After a three hour and thirty-eight minute interrogation, the defendant confessed that he shot and killed the victim while attempting to rob him. The defendant was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a), criminal attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-49 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-48 (a).[1] The defendant also was convicted, following a trial to the court, of criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a) (1), as amended by No. 13-3, § 44, of the 2013 Public Acts (P.A. 13-3).[2]

In this direct appeal, the defendant claims that the trial court improperly denied his motions to suppress (1) the firearm and related evidence seized from his residence, which he claims were discovered as a result of an unlawful search, and (2) the incriminating statements he made during his interrogation at the police station, which he claims were involuntary. We disagree with the defendant's claims and, accordingly, affirm the judgment of the trial court.

The fact finder reasonably could have found the following facts. On the evening of October 14, 2013, the defendant was at a social gathering on Goffe Terrace in New Haven with Nathan Johnson, Ebony Wright, and several others. Throughout the evening, the defendant was openly carrying around a Hi-Point nine millimeter assault rifle, which he kept inside of a bag that was slung around his neck. At some point during the evening, the defendant told Johnson that he was looking for someone to rob. Johnson then showed the defendant a list of individuals who previously had sold him marijuana that he kept in his phone. The defendant scrolled through the list and selected the victim as the person he wanted to rob. At the defendant's direction, Wright contacted the victim and arranged for him to meet her on Goffe Terrace under the pretense that she wanted to purchase marijuana from him.

Soon thereafter, the victim pulled up to the curb next to where the defendant, Wright and Johnson were walking, and Wright identified herself as the person who had contacted him. While Wright and the victim were talking, the defendant stepped into a dark alleyway, put on a mask and took out the assault rifle, which

he had been carrying in his bag. The defendant approached the victim, who was standing by the trunk of his car, pointed the rifle at him and demanded that he hand over all the valuables he had in his possession. The victim told the defendant that he "could have everything" and began walking away from the defendant toward the driver's seat of his car. The defendant then shot the victim twice in the back at close range. The victim died from his wounds.

The defendant, Johnson and Wright fled the scene on foot. The defendant returned to his residence at 374 Peck Street in New Haven, where he hid the rifle in his attic. Two spent nine millimeter shell casings were left at the scene.

A few days after the shooting, the police received a tip from a confidential informant that the defendant had admitted his involvement in the homicide and was still in possession of the rifle he had used in committing it. Shortly after midnight, on October 20, 2013, the police searched the defendant's residence at 374 Peck Street and discovered the assault rifle, several magazines, one of which had an extended clip, and multiple boxes of ammunition in the attic. A ballistics analysis revealed that the two shell casings found at the scene of the shooting had been fired from the rifle.

Thereafter, the police arrested the defendant and transported him to the New Haven Police Department in the early morning hours of October 20, 2013. At approximately 10:30 a.m. that morning, two detectives interviewed the defendant. Before questioning the defendant, the detectives advised the defendant of his *Miranda*[3] rights, and he waived those rights. Then, after approximately three hours of questioning, the defendant confessed that he had shot and killed the victim while attempting to rob him. The interview was recorded, as required by state law.

The state charged the defendant with murder, felony murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm. Prior to trial, the defendant filed motions to suppress the evidence discovered during the search of his home and the statements he had made to the police during his interrogation at the police station. After conducting an evidentiary hearing, the trial court issued memoranda of decision denying both motions.

After a trial, the jury found the defendant guilty of murder, felony murder and the robbery counts. The trial court found the defendant guilty of criminal possession of a firearm. After vacating the defendant's felony murder conviction; see footnote 1 of this opinion; the court imposed a total effective sentence of ninety years imprisonment without the possibility of release.

This direct appeal followed. Additional facts and pro-

cedural history will be set forth as necessary.

I

The defendant first claims that the trial court should have suppressed the rifle, ammunition, and magazines found in his home. Specifically, he argues that the police discovered these items as a result of an unlawful search of his residence, in violation of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. We disagree.

The following additional facts, as found by the trial court in its memorandum of decision denying the defendant's motion to suppress, are relevant to this claim. On October 18, 2013, Detective Martin Podsiad of the New Haven Police Department received a telephone call from a confidential informant who had served as a source of information for Podsiad in prior criminal investigations. The informant told Podsiad that he had recently had a conversation with the defendant in which the defendant admitted that he murdered the victim and indicated that he wanted to sell the rifle he had used to do so. The defendant sought to sell the rifle to the informant in exchange for cash and a handgun. Podsiad instructed the informant to arrange to purchase the rifle from the defendant with police funds. Podsiad determined, through a search of police department databases, that the defendant resided at 374 Peck Street in New Haven and had multiple felony convictions.

Podsiad believed that, in order to obtain a search warrant, he needed to verify the location of both the rifle and the defendant. At Podsiad's instruction, the informant arranged to meet the defendant at his residence the following evening, on October 19, 2013. At sometime between 6:30 and 8:30 p.m., Podsiad dropped the informant off at 374 Peck Street. Podsiad waited for the informant. The informant reemerged a few minutes later and, on the ride back to the police station, informed Podsiad that he saw a rifle and multiple boxes of ammunition in the defendant's bedroom. As he and Podsiad planned, the informant had given the defendant some money to place a hold on the rifle and told the defendant that he would return shortly thereafter with a handgun to complete the sale.

Podsiad immediately began preparing an application for a search warrant for 374 Peck Street. The police set up surveillance around the building complex to prevent the defendant from leaving before the warrant could be obtained. They also began coordinating with a SWAT team to make the entry into the defendant's residence when the time came.

At approximately 10:30 p.m., while Podsiad was still preparing the search warrant application, the police stopped a vehicle leaving the parking lot of the 374 Peck Street building complex. The defendant's sister and another individual were in the vehicle. Although

the police officers were driving an unmarked vehicle, they became concerned that people in the vicinity would notice their presence or that the occupants of the vehicle they had stopped might alert the defendant. The officers believed that, if the defendant received advance notice of their operation, he could escape with the rifle or begin preparing for a violent confrontation.

In light of these concerns, the officers decided to enter the defendant's residence in order to secure it until the warrant was obtained. They activated the SWAT team, which attempted to enter 374 Peck Street. The SWAT team chose the wrong door, however, and entered the adjacent apartment, 374B Peck Street. The defendant, who was inside his residence at 374 Peck Street, called the informant and told him not to return because the police were raiding the apartment next door.

Their element of surprise lost, the officers used a loudspeaker to order the occupants of 374 Peck Street to exit. The defendant and other occupants exited the residence. After detaining the defendant, the police entered the residence in order to conduct a protective sweep for any individuals who may not have exited. During the sweep, the officers noticed a small hole in the ceiling above the laundry area that led to the attic and thought someone might be hiding up there. An officer entered the attic and saw the rifle in plain view. The officers then waited for the warrant to issue before conducting any further search of the home.

At approximately 2:30 a.m., on October 20, 2013, a judge approved the search warrant application. Podsiad's affidavit in support of the application consisted of six paragraphs, only the third, fourth, and fifth of which are pertinent to the issue of probable cause.[4] Those paragraphs provide in relevant part: "3. In the last . . . twenty-four hours, this affiant was contacted by a cooperating witness . . . whose information has been proven true and reliable. At this time, the [c]ooperating [w]itness is kept anonymous for her/his safety, but, in the future, [he or she] will be willing to testify in court. The [cooperating witness] had spoke[n] to [the defendant] in the last . . . five days . . . . [The defendant] had told the [cooperating witness] that he was responsible for the homicide [that] took place on [October 14, 2013], on 1617 Ella T. Grasso [Boulevard in New Haven] . . . . [The defendant] also [told] the [cooperating witness] that he still has possession of the firearm [that] he used in the homicide and that he is trying to get rid of it. [The defendant] also told the [cooperating witness] that the firearm is a [nine millimeter]. I contacted [Sergeant Karl] Jacobson, who confirmed that the weapon allegedly used in the homicide was a [nine millimeter].

"4. Within the last . . . twenty-four hours, the [cooperating witness] was inside [the defendant's] residence at 374 Peck [Street] [in] New Haven . . . . The [coop-

erating witness] confirmed that [the defendant] was in possession of a black, rifle type firearm. The firearm was located in [the defendant's] bedroom on the upper floor of the two story apartment at 374 Peck [Street]. There were also . . . two magazines in the bedroom, a box containing ammunition, caliber unknown, and drug bags and drug paraphernalia on top of his bed.

"5. At [10:30 p.m.] this evening, during the writing of this search warrant, surveillance teams in unmarked vehicles were stationed around the area of 374 Peck [Street] to [ensure that] no evidence left the residence. While conducting surveillance, the teams observed a subject leave 374 Peck [Street] and enter a [vehicle]. Believing that the subject . . . might be in possession of evidence from 374 Peck [Street], the vehicle was stopped . . . . Inside the vehicle were . . . two subjects, Tyrell Kennedy . . . and Bobbi Griffin . . . . During the stop, it was discovered that Bobbi Griffin is the sister of [the defendant]. Both parties were detained due to the fact that releasing them might afford them the opportunity to contact [the defendant], and evidence may be removed or destroyed. The New Haven Police Department SWAT team made entry into 374 Peck [Street] and secured the residents. Inside the residence was [the defendant, and a criminal records] check revealed [that he] is a convicted felon."

The defendant moved to suppress the rifle and related evidence, asserting that the search was unlawful under both the federal and state constitutions because the search warrant had not yet issued and there were no exigent circumstances justifying the officers' preemptive seizure of his residence. Following an evidentiary hearing, the trial court denied the defendant's motion.

In its memorandum of decision, the trial court concluded that the officers' initial entry into and search of the defendant's residence, although conducted before the search warrant was issued, were justified by exigent circumstances. The court determined that the officers had probable cause to believe that a rifle and ammunition were inside the residence, as well as "an objectively reasonable belief that immediate, physical entry . . . was necessary to prevent the destruction or removal of evidence, or the flight of the defendant, and that the failure to take such immediate action may have also endangered [their] safety" or that of others. The court further determined that the police were justified in entering the attic as part of a protective sweep of the residence and that, as a result of the protective sweep, the rifle and ammunition were visible in plain view.

Alternatively, the trial court concluded that, even if the entry into the attic was not permitted as part of a protective sweep, it was nonetheless lawful under the independent source and/or inevitable discovery doctrines. The court reasoned that the police were already in the process of obtaining a search warrant and that

Podsiad's affidavit established probable cause without relying on any information obtained during the initial entry. The court therefore concluded that the evidence would lawfully have been discovered even if the initial entry was improper.

On appeal to this court, the defendant challenges both bases for the trial court's decision. With respect to the first, the defendant argues, in part, that the exigent circumstances exception is inapplicable in this case because the police created the exigency by stopping the vehicle that was leaving the defendant's residence. As to the second basis, the defendant concedes that, if Podsiad's search warrant affidavit established probable cause, then the seizure of the evidence was lawful under either the independent source or inevitable discovery doctrines, or under both doctrines. The defendant contends, however, that Podsiad's affidavit failed to establish probable cause because it was based on information provided by an informant, rather than Podsiad's own observations, and failed to set forth sufficient facts to establish the informant's reliability. We conclude that Podsiad's affidavit was supported by probable cause and, therefore, that the trial court properly denied the defendant's motion to suppress based on the independent source doctrine.[5] Accordingly, we need not determine whether the initial warrantless entry and protective sweep were justified by exigent circumstances.

Before addressing the sufficiency of Podsiad's affidavit, we note briefly the relevant principles of the independent source doctrine. "It is well recognized that the exclusionary rule has no application [when] the [g]overnment learned of the evidence from an independent source. . . . Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 333, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

The defendant concedes, and we agree, that the police did not make their decision to seek the search warrant based on any information obtained during their allegedly unlawful entry and protective sweep because Podsiad had already begun the process of obtaining the warrant when the entry occurred. The remaining question is whether Podsiad's affidavit, excised of any potentially tainted information, established probable cause for the search.[6]

"The determination of whether probable cause exists to issue a search warrant under article first, § 7, of our state constitution,[7] and under the fourth amendment to the federal constitution,[8] is made pursuant to a totality of the circumstances test. . . . Under this test, in determining the existence of probable cause to search, the issuing judge must make a practical, nontechnical decision whether, given all the circumstances set forth in the warrant affidavit, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . .

"If a search warrant affidavit is based on information provided to the police by a confidential informant, the issuing judge should examine the affidavit to determine whether it adequately describes both the factual basis of the informant's knowledge and the basis on which the police have determined that the information is reliable. If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the [judge] can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists. In making this determination, the [judge] is entitled to draw reasonable inferences from the facts presented." (Citations omitted; footnotes added; internal quotation marks omitted.) *State* v. *Rodriguez*, 223 Conn. 127, 134–35, 613 A.2d 211 (1992). Therefore, although no single factor is dispositive, "the veracity or reliability and basis of knowledge of [the informant] are highly relevant in the issuing judge's analysis of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Flores*, 319 Conn. 218, 226, 125 A.3d 157 (2015), cert. denied,     U.S.    , 136 S. Ct. 1529, 194 L. Ed. 2d 615 (2016); see also *State* v. *Respass*, 256 Conn. 164, 175, 770 A.2d 471 ("an informant's veracity or reliability and basis of knowledge should be regarded as closely intertwined issues that may usefully illuminate the [commonsense], practical question of the existence of probable cause" (internal quotation marks omitted)), cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

"When [an issuing judge] has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the [issuing judge]." (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 223 Conn. 135. "[W]e will uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [issuing judge's] conclusion that probable

cause existed. . . . [We] will not invalidate a warrant . . . merely because we might, in the first instance, have reasonably declined to draw the inferences that were necessary . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Flores*, supra, 319 Conn. 225–26.

In the present case, the defendant's sole challenge to the adequacy of Podsiad's affidavit is that "it does not provide sufficient information to establish the informant's reliability." The defendant's principal argument concerns the lack of any factual basis to indicate that the informant had a track record of providing reliable information. The defendant contends that the assertion in the affidavit that the informant's "information has been proven true and reliable" is too general and conclusory to be given any weight. Applying the totality of the circumstances test, we conclude that Podsiad's affidavit established probable cause.

We note at the outset that, although "an informant's record of providing information that led to arrests and seizures of contraband is sufficient to establish [his or her] reliability"; *State* v. *Smith*, 257 Conn. 216, 224, 777 A.2d 182 (2001); see also *State* v. *Rodriguez*, supra, 223 Conn. 136; a good track record is not an essential prerequisite of reliability. "[I]t is improper to discount an informant's information simply because he has no proven record of truthfulness or accuracy. . . . [The informant's] veracity can be shown in other ways." (Citations omitted; internal quotation marks omitted.) *United States* v. *Canfield*, 212 F.3d 713, 719 (2d Cir. 2000); see, e.g., *State* v. *Flores*, supra, 319 Conn. 226 (noting common factors for determining reliability of "as yet untested" informant);[9] *State* v. *Batts*, 281 Conn. 682, 704 n.9, 916 A.2d 788 ("[w]e disagree . . . that the informant lacked reliability simply because he or she had no established track record with the police"), cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007).

Nor do we entirely agree with the defendant that the assertion in Podsiad's affidavit that the informant's "information has been proven true and reliable" was entitled to no weight in the reliability analysis. The issuing judge reasonably could have inferred from this assertion that the informant had provided information to the police in connection with at least one prior criminal matter that proved to be true and reliable. Such an assertion provides at least some information about the informant's past performance.[10] See, e.g., *United States* v. *Woosley*, 361 F.3d 924, 927–28 (6th Cir. 2004) (relying on averment that informant " 'has provided accurate information in the past' " in finding probable cause); *State* v. *DeFusco*, 224 Conn. 627, 643, 620 A.2d 746 (1993) (assertion in search warrant affidavit that informant had been used " 'numerous times in the past for various narcotic[s] cases' " permitted issuing judge reasonably

to infer that "the informant had given trustworthy information in the past and, therefore, was reliable").

It is true, however, that the affidavit does not disclose any details to substantiate the averment that the informant's information has been proven true and reliable, such as the nature of the information, whether it led to any seizures, arrests, or convictions, or the number of times the informant provided information that was reliable. The inference of reliability certainly would have been better supported and on firmer footing if the affiant had specified that the informant's information had led to prior seizures, arrests, or convictions. Compare *State* v. *DeFusco*, supra, 224 Conn. 643–44 ("inference [of reliability] would have been better supported by an affirmative statement by the affiants that this informant's information had, in the past, led to arrests and convictions"), with *State* v. *Rodriguez*, supra, 223 Conn. 136 (affidavit specified that information provided by informant in prior cases had "led to arrests and convictions").

Thus, the affidavit in this case favorably characterizes the informant's past performance but "leaves the nature of that performance undisclosed, so that the [issuing judge] making the probable cause determination has no basis for judging whether the [police] officer's characterization of that performance is justified." 2 W. LaFave, Search and Seizure (5th Ed. 2012) § 3.3 (b), p. 152. Accordingly, we conclude that the unsupported assertion that the informant's information has proven to be true and reliable, although not irrelevant, was entitled only to slight weight in the probable cause analysis. See, e.g., *United States* v. *Foree*, 43 F.3d 1572, 1575–76 (11th Cir. 1995) (assertion that informant "has provided reliable information in the past" is " 'entitled to only slight weight' " because it " 'leaves the nature of that [past] performance undisclosed' "); *United States* v. *Miller*, 753 F.2d 1475, 1480 (9th Cir. 1985) (averment that informant had provided federal agent with prior information that agent " 'knows to be true through investigative activity' " is "both unclear and conclusory" and, therefore, "entitled to only slight weight").

Nonetheless, other aspects of Podsiad's affidavit established the informant's reliability. First, as the defendant acknowledges, the affidavit makes clear that the informant's identity was known to the police. "[A]s this court has repeatedly recognized, [t]he fact that an informant's identity is known . . . is significant because the informant could expect adverse consequences if the information that he provided was erroneous. Those consequences might range from a loss of confidence or indulgence by the police to prosecution for . . . falsely reporting an incident under General Statutes § 53a-180 [c], had the information supplied proved to be a fabrication." (Internal quotation marks

omitted.) *State* v. *Flores*, supra, 319 Conn. 228.

According to the affidavit, the informant told Podsiad that he had seen "a black, rifle type firearm," as well as two magazines and a box of ammunition, inside the defendant's bedroom at 374 Peck Street. If a search by the police did not uncover any such evidence, the informant reasonably "could have expected adverse consequences for relaying false information." *State* v. *Flores*, supra, 319 Conn. 228; see, e.g., *United States* v. *Foree*, supra, 43 F.3d 1576 ("[a]s [the informant's] report consisted of facts readily verifiable upon a subsequent search by the police . . . the [informant] was unlikely to be untruthful, for, if the warrant issued, lies would likely be discovered in short order"). Accordingly, it was reasonable for the issuing judge to infer that the informant's claim that he saw the rifle and related evidence in the defendant's bedroom had not been fabricated.

Second, the affidavit avers that, "in the future, [the informant] will be willing to testify in court." As the Supreme Court of Virginia aptly observed, such an assertion bolsters the reliability of the information provided by the informant: "It is true, as the defendant argues, that the allegation that the informer was 'willing to testify in court' did not bind him to testify. But the average citizen knows that when he does appear in court he must take an oath to tell the truth, he faces a charge of perjury for testifying falsely, and he may be confronted with prior inconsistent statements when cross-examined. With this beforehand knowledge, when one expresses a willingness to testify in court and stand by what he has told the police, an aura of credibility is added to his story which establishes its probability." *McNeill* v. *Commonwealth*, 213 Va. 200, 203, 191 S.E.2d 1 (1972); see, e.g., *United States* v. *Brown*, 93 Fed. Appx. 454, 456 (3d Cir.) ("[t]he affidavit's recitation of the informant's availability to have his veracity tested at all court proceedings also bolstered the reliability of the informant's information"), cert. denied, 542 U.S. 914, 124 S. Ct. 2868, 159 L. Ed. 2d 285 (2004). Although we acknowledge that an informant's willingness to testify in court proceedings may not, on its own, be sufficient to establish reliability, it is nevertheless an appropriate factor for the issuing judge to consider when examining an affidavit.

Third, the affidavit indicates that Podsiad independently corroborated certain information provided by the informant. See, e.g., *State* v. *DeFusco*, supra, 224 Conn. 644 ("corroboration would be a proper ground on which to base an inference of reliability"). In particular, the affidavit asserts that the defendant told the informant that he shot the victim using a nine millimeter caliber firearm, and that Podsiad "contacted [another police officer involved in the investigation], who confirmed that the weapon allegedly used in the homicide was a

[nine millimeter].'' The corroboration of the caliber of the firearm used in the shooting entitled the issuing judge to give greater weight to the informant's claim that the defendant admitted to shooting the victim with that same caliber weapon.[11] See, e.g., *State* v. *Rodriguez*, supra, 223 Conn. 137 (assertion in affidavit that informant saw defendant carrying '' 'large caliber revolver' '' shortly before shooting was corroborated, and thus entitled to reliability, by evidence that ''the murders were committed with a large caliber handgun'').

Moreover, contrary to the defendant's criticism that the affidavit failed to corroborate any details that ''only the shooter might know,'' it is well settled that ''[t]he police are not required . . . to corroborate all of the information provided by a confidential informant. . . . Partial corroboration may suffice.'' (Citations omitted.) *State* v. *Clark*, 297 Conn. 1, 11, 997 A.2d 461 (2010). We conclude that the corroboration of the weapon's caliber, in conjunction with the aforementioned factors, provided strong evidence of the informant's reliability.

Finally, any doubts as to whether the affidavit establishes the informant's reliability are mitigated by the clear showing of the informant's basis of knowledge. Under *Illinois* v. *Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), an informant's reliability and basis of knowledge are no longer independent requirements for a finding of probable cause; rather, ''a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'' Id., 233. ''It is clear from *Gates* that, in measuring overall the reliability of a tip, a fair indication of the informant's basis of knowledge may compensate for a less than conclusive demonstration of his credibility.'' *United States* v. *Laws*, 808 F.2d 92, 102 (D.C. Cir. 1986). Thus, ''even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.'' *Illinois* v. *Gates*, supra, 234; see, e.g., *State* v. *Johnson*, 286 Conn. 427, 440, 944 A.2d 297 (''the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him [firsthand] information . . . [as] when a person indicates he has overheard the defendant planning or admitting criminal activity'' (internal quotation marks omitted)), cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008).

Podsiad's affidavit indicates that the information the informant provided to him was based on the informant's firsthand observations. The affidavit alleges that the defendant admitted to the informant that he shot the victim, and that the informant personally observed the rifle and ammunition inside the defendant's residence. We conclude that the issuing judge could rely on this

particularized knowledge to overcome uncertainty as to the informant's reliability or veracity. See, e.g., *State* v. *Smith*, supra, 257 Conn. 225 (noting that informant's overhearing of defendant's planning or admitting criminal activity was " 'highly relevant' " to establishing probable cause under *Gates*); *State* v. *Morrill*, 205 Conn. 560, 566, 534 A.2d 1165 (1987) ("The affidavit states that the informant personally observed the defendant sell [marijuana] and [that] he heard the defendant state that he had ten pounds to sell. From these statements the [issuing judge] could reasonably have inferred that the defendant was engaged in the ongoing criminal activity of selling [marijuana].").

Based on the totality of the circumstances, we conclude that Podsiad's search warrant affidavit, excised of any potentially tainted information from the initial warrantless entry, established probable cause to search the defendant's residence. Accordingly, the trial court properly denied the defendant's motion to suppress the evidence obtained during the search of his residence based on the independent source doctrine.

## II

The defendant next claims that the trial court improperly denied his motion to suppress the statements he made to the police during his interrogation. Specifically, the defendant argues that, because the police officers subjected him to a series of coercive interrogation tactics that had the combined effect of overbearing his will, his statements were involuntary and, thus, should have been suppressed under the due process clause of the federal constitution.

In particular, the defendant asserts that the police officers overbore his will by (1) lying about the evidence they possessed in order to make their case against him seem stronger than it actually was, (2) maximizing the potential consequences if he did not confess by threatening him with lengthy prison sentences and, at one point, intimating that he could receive the death penalty, (3) telling him that his family members may be subject to arrest for possession of the assault rifle discovered during the search of 374 Peck Street, and (4) suggesting that he would face lesser charges or consequences if he did confess. The defendant further asserts that he was especially susceptible to these coercive tactics because he had not slept since the police had searched his residence the night before. Alternatively, the defendant contends that his statements should have been suppressed under the Connecticut constitution. We disagree with the defendant's claims.

The following facts, which either were found by the trial court or are undisputed,[12] are relevant to this claim. At the time of the October 14, 2013 shooting, the defendant was twenty-one years old. He was in the process of obtaining his general equivalency diploma (GED)

and had plans to pursue a degree in culinary arts and business management at Gateway Community College. He was employed full-time as a chef for Chipotle Mexican Grill (Chipotle). He had four prior felony convictions, most recently in September, 2010, for larceny in the third degree in violation of General Statutes § 53a-124. For that conviction, he was sentenced to five years imprisonment, execution suspended after thirty months, and three years of probation.[13]

Shortly after midnight, on October 20, 2013, while the police were conducting the preemptive sweep of the defendant's 374 Peck Street apartment, the defendant was detained on the scene in a police cruiser. The officers read the defendant his *Miranda* rights, which the defendant indicated he understood. Then, while the defendant was detained, Podsiad and an additional officer questioned him for approximately three minutes about the rifle they found in the attic. The defendant admitted that the gun belonged to him.[14]

Sometime in the early morning hours of October 20, 2013, the defendant was transported to the New Haven Police Department and placed in a holding cell. The defendant was unable to sleep while in the holding cell because it did not have a bed.[15] Later that morning, Detectives Nicole Natale and David Zaweski of the New Haven Police Department asked the defendant if he was willing to speak with them, and the defendant indicated that he was.

At approximately 10:30 a.m., Natale and Zaweski brought the defendant to an interrogation room, where they interviewed him for approximately three hours and thirty-eight minutes. The interview was recorded on video. The interrogation room was approximately fifteen feet by fifteen feet. The detectives sat the defendant at a table facing the camera. Natale sat at the table across from the defendant, and Zaweski sat in a chair against the wall behind Natale. The interview proceeded in a question and answer format. Natale asked most of the questions, with Zaweski interjecting intermittently. Both officers remained seated at all times while questioning the defendant. There were three three to ten minute periods, approximately every hour, during which one or both of the officers left the room and the questioning ceased.

Natale began by advising the defendant of his *Miranda* rights. She handed the defendant a *Miranda* waiver form and had him read his rights out loud from the form. Natale then asked the defendant: "Do you understand that? Are you willing to talk to us?" The defendant responded: "Yes." Zaweski then removed the defendant's handcuffs. The defendant then initialed each line of the waiver form and signed and dated it.[16]

Natale started with questions about the assault rifle and ammunition seized from the defendant's apartment

at 374 Peck Street. The defendant claimed that the rifle belonged to a third party, whom he identified as "Quan Bezzle," but that he "took the charge" because he did not want any of his family members to "go down for it . . . ."

Natale then asked the defendant if he had "hear[d] anything about any homicides." The defendant responded that he heard about the one that had just occurred "on the Boulevard." The discussion then turned to the circumstances of the victim's murder. The defendant denied knowing anything about the homicide beyond what he had heard from media reports.

At this point, approximately twenty minutes into the interview, Natale's tone changed from conversational to accusatory. For the remainder of the first hour of questioning, Natale began employing the interrogation tactics that the defendant now complains of on appeal. She confronted the defendant with the "evidence" of his guilt, some of which she had fabricated. Natale falsely told the defendant that two individuals who witnessed the homicide identified him from a photographic array as the shooter. Natale emphasized this false evidence at least six times during the first hour of questioning. Natale also told the defendant, falsely, that fingerprints were found on the shell casings left at the scene of the shooting and speculated that they would match the defendant's prints when the forensic testing was completed.[17]

In addition, Natale offered the defendant favorable scenarios that could have potentially diminished his culpability and emphasized the severity of the sentence that he could receive for murder. Natale suggested that she thought the defendant "might have just been in the wrong place at the wrong time." Natale later emphasized that the defendant would inevitably be charged with some form of murder and that "the only difference . . . depending on our conversation today . . . is felony murder or being in the wrong place at the wrong time murder. You could either be the shooter, or the person [who] sits there and doesn't know what the fuck was going on, and was just in the wrong place at the wrong time. . . . You potentially don't have a chance to go home for sixty-five years, depending on how the outcome of today goes between me and you . . . ." At one point, Natale told the defendant that the witnesses who identified him had indicated that a second person was with him and that "you could get yourself out of this mess . . . if you tell the truth" about who else was there.

Natale also brought up the defendant's family members, at one point telling him that, although she "probably ha[d] no say in this," "your mom and your sister are probably gonna go down for that gun as well," and "they're probably gonna do warrants for them. Especially [because] you haven't shed any light on what's

been going on with this."

Despite Natale's tactics, the defendant continued to categorically deny any knowledge of the homicide for the entire first hour of questioning. He pushed back on Natale's false evidence ploys, telling her that he "want[ed] to meet these people" who had supposedly identified him, and that "there ain't none of my fingerprints" on the shell casings. When Natale emphasized the virtual inevitability that the defendant would "go down" for the murder and that he was facing a potential sixty-five year jail sentence, the defendant responded, "I guess I'll take it to trial then," and, "I gotta see how it play[s] out. Hope for the best, pray for the wors[t]." At around forty minutes into questioning, after Natale again brought up the phony identification witnesses, the defendant had the following exchange with Natale:

"[The Defendant]: . . . . I don't be around nobody. I don't do nothing. I don't [know] why people put me in this stuff. . . . I just came home six months ago. Now I'm caught up in fucking bullshit over . . . fucking nothing. Excuse my language.

"Natale: That's why you should start talking. Tell me, what happened?

"[The Defendant]: I'm telling you the best I know.

"Natale: No, you're not. No, you're not. You're willing to go down for this by yourself?

"[The Defendant]: If that's what it takes. Innocent person go down gonna take a long time. I gotta do what I gotta do."

At approximately 11:30 a.m.—one hour into questioning—Natale left the room. When she returned a few minutes later, the defendant asked whether, if he told "the truth about who did it," he could "get some type of protection . . . ." After Natale assured him that he could, the defendant told her that he witnessed "Quan Bezzle" shoot and kill the victim, and that Quan Bezzle threatened to kill him if he ever told the police. As the defendant said this, he buried his face into his shirt and, as he admitted at trial, pretended to cry. The defendant then emotionally proclaimed that he initially had withheld this information because Quan Bezzle knows where he lives, and he did not want "nothing to happen" to his sister and little niece, who live with him. According to the defendant, after Quan Bezzle shot the victim, the defendant ran to a pharmacy[18] to retrieve his bicycle and then rode his bicycle home. This story included his riding his bicycle from the pharmacy back in the direction of the crime scene and past the victim's lifeless body.

The defendant continued to falsely accuse Quan Bezzle of the murder through nearly two additional hours of questioning, despite Natale's and Zaweski's repeatedly telling him that they knew his story was a lie. Natale

and Zaweski continued to remind him of his false story regarding Quan Bezzle and the fingerprint evidence, and they also repeatedly asserted that Wright, whom they had not actually yet spoken to, had told them that she was present at the shooting and that the defendant was there also.[19] They also continued to offer alternative scenarios to the defendant, such as that he shot the victim but did so accidentally or in self-defense. In addition, they continued to emphasize the lengthy prison sentence that the defendant was likely to receive. At one point, Natale made an apparent reference to the death penalty:

"Natale: . . . Do you see all the . . . little things that are gonna go in the report, that are just gonna?

"[The Defendant]: I ain't do nothing.

"Natale: Fry you? They're gonna put you in the chair. You gotta at least admit that that story's crazy. Whether it's true or not, doesn't it sound silly?"[20] The defendant had no noticeable or audible response to this statement.

Nevertheless, the defendant stuck to his story that he was innocent and that Quan Bezzle had shot the victim, until approximately 1:30 p.m.—three hours into the interrogation. At that point, the defendant's attempts to fabricate stories about Quan Bezzle and about his whereabouts on the night of the murder, including how he had used his bicycle to ride home after Quan Bezzle shot the victim, had all fallen apart. The following colloquy demonstrates that, immediately prior to confessing, it became apparent that the defendant's multiple lies were crumbling:

"Zaweski: So, you go and you get your bike, and then where do you go?

"[The Defendant]: I go home.

"Zaweski: To where?

"[The Defendant]: Fair Haven.

"Zaweski: And how do you get there?

"[The Defendant]: My bike.

"Zaweski: I know on a bike. How do you, what roads [do] you take?

"[The Defendant]: I go up, um, I go up on the Boulevard. I go up Bellevue.

"Zaweski: Tell me, you did not just say that. How, how do you get home?

"[The Defendant]: My bike.

"Zaweski: Yeah, what roads do you take?

"[The Defendant]: The Boulevard.

"Zaweski: Okay, so, you went back up past the crime scene?

"[The Defendant]: Mm-hmm.

"Zaweski: You didn't do that.

"Natale: Bobby, you getting tired?

"[The Defendant]: Yeah.

"Natale: 'Cause you're, you're, that's crazy.

"Zaweski: Seriously, you wanna tell us you took your bike back all the way uphill, past the dead guy lying in the street and all the cops that were right there?

"Natale: Bobby, open your eyes."

This conversation continued as the defendant stuck to his story that he rode his bicycle home but was unable to explain which roads he took home and why he rode past the crime scene. Natale commented, "[y]ou can't even keep up with your own lies . . . ." Zaweski then explained: "We're not trying to confuse you, alright, but you're confusing us. You understand that? Everything you're telling us is just not making any sense."

Natale then said: "And you need to figure out what is going on here. Because you are looking at sixty-five years alone. With no conspirator because Quan [Bezzle] did not shoot this guy. Figure it out. And it better be quick 'cause you're digging yourself deeper and deeper. Now you don't know if you're at your girl's house or your mom's house. You're just lying and lying and lying. Covering yourself up. Trying to get out of this. And you're not gonna get out of it. The only thing that you're gonna do is make it better for yourself in the long run. That's the only thing you're gonna do. I could tell you're a mope. But, you're not a mope 'cause you can't even, you can't even lie. You can't even lie. Look at all the lies. Four pages of lies. You're not a criminal. You're not a killer. First you're at your sister's house. Then you're at CVS, then Walgreens. It, I mean just five pages of, I'm on my sixth page now of complete lies."

A few minutes later, Natale said in relevant part: "I don't think you have any idea of how serious this is. No clue. The choice is yours. Murder, manslaughter. That's your choice. That's what you're looking at. Right now, you're looking at murder, felony murder. Just [because] you're being a knucklehead and not coming to grips that you're fucked if you continue to stick with this story. We have too much against you. Too much against you . . . [for you] to sit here and stick with the story that you're telling us."

The defendant then asked: "So, how much time do I get for manslaughter?" Natale responded: "I wouldn't be worried about time right now. I'd be worrying about . . . what your end result story's gonna be. . . . You have to worry about telling the truth right now and coming clean." The defendant responded, "[a]lright, I'll tell the truth," and proceeded to confess in detail to

his role in the murder. He explained how he, Wright, and Johnson lured the victim to the scene and admitted that he shot the victim twice in the back while attempting to rob him but claimed that it "was an accident," and that he "didn't mean to shoot him twice. [He] didn't even press the trigger, actually." The officers concluded the interrogation shortly thereafter. The video recording depicted Natale ordering food for the defendant after the questioning ended, and the defendant eating the food that ultimately arrived.

Prior to trial, the defendant moved to suppress all evidence of the statements he made during the interrogation, citing what he claimed were the officers' coercive interrogation tactics, as well as his diminished ability to resist due to a lack of sleep. The trial court conducted an evidentiary hearing, at which the state introduced Zaweski's testimony, as well as the video recording and transcript of the interrogation. The defendant did not offer any evidence in support of his claims at the hearing.

With respect to the general tenor of the interrogation, the trial court found, on the basis of its review of the video recording, that "[the defendant] did not manifest any outward signs of intoxication. . . . The defendant at no point asked [Natale or Zaweski] to stop the interview and at no point asked to speak with an attorney. . . . The tenor of the questioning ranged from conversational to accusatory over the entire length of the interview . . . . The police remained seated during the entirety of the questioning, as did the defendant. The police did not stand up, display their weapons, or invade the 'personal space' of the defendant during their questioning. [Although] the police were at some points contentious in their questioning, at no point did the defendant's demeanor appear to change in response to the aggressive nature of the questioning. The defendant remained largely calm and low-key throughout the interview. He characterized himself, generally, as a 'calm' person. . . . The defendant appeared at ease contesting the accusations being made by the police during the interview . . . . He had no difficultly jousting with his interrogators. . . .

"There is no evidence before the court demonstrating that the defendant suffered from any mental or psychological infirmity, or was susceptible to coercion on the basis of age or education. The [video-recorded] interview demonstrates that the defendant had the capacity to understand his right against self-incrimination and seemed under control emotionally and psychologically. The defendant, approximately three-quarters into the interview, was asked if he was tired because he closed his eyes. The defendant responded that he was tired, but . . . the remainder of the interrogation did not demonstrate any change in his response time to the questions being asked or his ability to logically commu-

nicate. His answers throughout the interview, including after the reference to his tiredness, uniformly had a contextual relationship to the questions being asked. He communicated coherently and rationally. He never manifested any confusion in his communications at any point in the interrogation."

The trial court denied the defendant's motion to suppress in a memorandum of decision, concluding that the state had proven by a preponderance of the evidence that the defendant's statements were voluntary. In reaching this conclusion, the court began by noting that the defendant was advised of and waived his *Miranda* rights on two occasions prior to the interview, which diminished the coercive nature of the interview.

The court then addressed individually the tactics specifically complained of by the defendant, determining that they were not inherently coercive and/or were not in fact causally related to the defendant's decision to confess. First, the court concluded that the officers' false evidence ploys did not render the defendant's statements involuntary because the video recording of the interview demonstrated that this tactic was "ineffectual" on the defendant. The court found that the defendant "demonstrated a large degree of self-savvy and assuredness," as evidenced by the fact that he concocted the Quan Bezzle artifice and "calmly parried with the police in an effort to test their claims" about the evidence they supposedly possessed against him.

Second, the court rejected the defendant's assertions that the officers coerced his statements with impermissible minimization tactics or promises of leniency. The court reasoned that, although Natale and Zaweski mentioned lesser degrees of murder "that could be *available* in the event of an inculpatory statement," they gave him "no specific assurances that giving a statement would affect the manner or outcome of the criminal proceedings." (Emphasis in original.) Moreover, the court found that the officers' comments were not a "motivating cause of [the defendant's] confession."

Third, the court rejected the defendant's claim of impermissible threats of severe punishment. The court determined that, although Natale's reference to the death penalty was "plainly ill-advised," it did not "work to overbear the defendant's will to resist and was not causally related to his ultimate confession." The court noted that it was a "single, isolated" comment made approximately midway through the interview, the video recording demonstrated that it did not prompt any "overt reaction" by the defendant, and the defendant "continued to deny his involvement in the homicide until well after this single comment." Moreover, the court emphasized that, when the defendant did confess, "his voice was calm and deliberate . . . ."

Fourth, the court addressed Natale's comment that

the defendant's mother and sister "are probably gonna go down for that gun," "[e]specially [because] you haven't shed any light on what's been going on" with the murder. The court acknowledged that the police "tread on dangerous ground" when they make such comments but ultimately found that Natale's comment "was insufficient to overbear the defendant's will to resist and was not causally related to his confession." The court noted that the defendant was already aware of his family's potential exposure for the rifle because he brought up the issue himself, without any prompting from Natale, at the start of the interview when he said he " 'took the charge' " for the rifle, so that his family would not " 'go down for it . . . .' " The court found that the defendant "responded dispassionately" and appeared to have "brushed off" Natale's subsequent comment, which "suggests that he recognized [it] as an empty and vacuous ploy."

Finally, addressing the defendant's assertion that his ability to resist was diminished by lack of sleep, the trial court found, based on its review of the video recording of the interrogation, that the defendant was not "suffer[ing] from a lack of mental acuity or physical infirmity as a result of a lack of sleep that rendered his statement[s] involuntary." The court found that the defendant never "manifested any outward signs [that] suggest[ed] he did not understand the questions being asked, [or] the purpose of the interview, or that his will was overborne." To the contrary, the court found that the defendant "had no problem jousting with the police throughout the interview," was able to "communicate clearly and coherently," and generally "demonstrated a capacity to resist police accusations regarding the homicide."

Accordingly, the court denied the defendant's motion to suppress and admitted evidence of the defendant's statements, including the video recording and transcript thereof, at trial.

### A

We begin with the defendant's claim under the federal constitution. The defendant argues that the trial court incorrectly determined that the police officers' coercive tactics, coupled with his diminished capacity to resist due to a lack of sleep, did not render his statements involuntary. We are not persuaded.

The governing legal principles are well established. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free

and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded [in] a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution, however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . .

"It is well settled that [t]he state bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence. . . . [As for the scope of our review] we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . .

"[A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . [A]pplying the proper scope of review to the ultimate issue of voluntariness requires us . . . to conduct a plenary review of the record in order to make an independent determination of voluntariness." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 321–22, 96 A.3d 1199 (2014).

We emphasize at the outset that, insofar as the trial court's underlying factual findings were predicated on its review of the video recording of the interrogation, we nonetheless defer to those findings unless they are clearly erroneous. A trial court's findings are entitled to deference, even if they are predicated on documentary evidence that this court is equally able to review for itself on appeal, rather than on the credibility and demeanor of the testifying witnesses. See, e.g., *State* v. *Lawrence*, 282 Conn. 141, 157, 920 A.2d 236 (2007) ("it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations"); see also, e.g., *Skakel* v. *State*, 295 Conn. 447, 487 n.25, 991 A.2d 414

(2010) (rejecting proposition that "a less deferential standard [of review applies to] decisions pertaining to evidence that is not predicated on an assessment of the witness' demeanor"); *Besade* v. *Interstate Security Services*, 212 Conn. 441, 448–49, 562 A.2d 1086 (1989) (same). Accordingly, we are bound by the trial court's interpretation of what is reflected in the video recording unless it is clearly erroneous.[21] See, e.g., *State* v. *Weathers*, 188 Conn. App. 600, 632, 205 A.3d 614 (2019) (holding that clear error review applies to trial court's finding, based on video recording, that defendant was not experiencing mental breakdown at time of crime), aff'd, 339 Conn. 187,      A.3d      (2021).

Turning to the substantive question of voluntariness, because the totality of the circumstances test "depend[s] [on] a weighing of the circumstances of pressure against the power of resistance of the person confessing"; (internal quotation marks omitted) *Dickerson* v. *United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); we begin by addressing the circumstances of the interrogation before turning to the defendant's personal characteristics and the extent to which they enabled him to resist the pressures imposed on him.[22] Applying this method, and having carefully reviewed the video recording of the interrogation and transcript thereof, we conclude that the trial court correctly determined that the state met its burden of establishing the voluntariness of the defendant's statements by a preponderance of the evidence.

We observe, at the outset, that the defendant was twice advised of his *Miranda* rights prior to being interrogated: first, in the police cruiser outside of 374 Peck Street, several hours before the interview, and second at the start of the interview with Natale and Zaweski. See, e.g., *State* v. *Lapointe*, 237 Conn. 694, 734, 678 A.2d 942 (provision of *Miranda* rights "is relevant to a finding of voluntariness"), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). On both occasions, the defendant indicated that he understood his rights and nonetheless waived them and agreed to speak with the police.

The provision of adequate *Miranda* warnings is significant in our analysis because it has a bearing on both sides of the voluntariness calculus: "It bears on the coerciveness of the circumstances, for it reveals that the police were aware of the suspect's rights and presumably prepared to honor them. And . . . it bears [on] the defendant's susceptibility, for it shows that the defendant was aware he had a right not to talk to the police." 2 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 6.2 (c), p. 712; see, e.g., *Berkemer* v. *McCarty*, 468 U.S. 420, 433, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (purpose of *Miranda* warning is to "ensure that the police do not coerce or trick captive suspects into confessing . . . [and] to relieve the inherently compelling

pressures generated by the custodial setting itself, which work to undermine the individual's will to resist" (emphasis omitted; footnote omitted; internal quotation marks omitted)); *State* v. *Correa*, 241 Conn. 322, 338, 696 A.2d 944 (1997) ("[a] [*Miranda*] warning at the time of the interrogation is indispensable to overcome its pressures and to [e]nsure that the individual knows he is free to exercise the privilege at that point in time" (internal quotation marks omitted)). Therefore, the United States Supreme Court repeatedly has recognized that, although "compliance with *Miranda* [does not] conclusively [establish] the voluntariness of a subsequent confession . . . cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." (Internal quotation marks omitted.) *Berkemer* v. *McCarty*, supra, 433 n.20; see, e.g., *Evans* v. *Dowd*, 932 F.2d 739, 742 (8th Cir.) ("the [*Miranda*] warnings were part of the totality of the circumstances and, thus, it would be difficult to conclude that the police coerced the confession while at the same time warning [the defendant] that he need not say anything"), cert. denied, 502 U.S. 944, 112 S. Ct. 385, 116 L. Ed. 2d 335 (1991).

We are unconvinced that this is one of those rare cases. We disagree with the defendant that the circumstances of the interrogation were so coercive as to overbear his will. The defendant takes issue with the following four interrogation tactics utilized throughout the interrogation by Natale and Zaweski: (1) false evidence ploys; (2) maximizing the consequences of not confessing; (3) threatening the defendant's family with arrest; and (4) suggesting that confessing would be met with leniency.[23] We agree with the trial court that the record demonstrates that the combined effect of these tactics did not cause the defendant's will to be overborne.

First, it is undisputed that Natale and Zaweski repeatedly referenced evidence that they did not have in order to give the impression that their case against the defendant was stronger than it actually was. The defendant specifically notes that they falsely claimed that two eyewitnesses to the murder had identified the defendant as the shooter, that fingerprints were found on the shell casings left at the scene of the shooting, and that Wright had given a statement that incriminated the defendant.

In *State* v. *Lapointe*, supra, 237 Conn. 694, this court held that a defendant's incriminating statement had not been obtained involuntarily when the police falsely represented that his fingerprints were found on the handle of the knife used to murder the victim. Id., 731–32. This court observed: "Such statements by the police designed to lead a suspect to believe that the case against him is strong are common investigative tech-

niques and would rarely, if ever, be sufficient to over-bear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." Id., 732. This court has repeated this observation in subsequent cases. See, e.g., *State* v. *Lawrence*, supra, 282 Conn. 176; *State* v. *Pinder*, 250 Conn. 385, 423, 736 A.2d 857 (1999). The defendant asks us to overrule or limit this aspect of *Lapointe*, not necessarily to "completely prohibit the use of ruses and ploys in interrogations," but, instead, to "discourage the practice by concluding that false statements about evidence, combined with other coercive tactics," may undermine a defendant's will.

Although we do not interpret *Lapointe* as suggesting that false evidence claims can never contribute to the involuntariness of a confession, we take this opportunity to emphasize that misrepresentations by interrogating officers about the strength of their case against a defendant can, under certain circumstances, add to the coercive nature of an interrogation. We decline at this time, however, to categorically condemn the use of such tactics or to adopt any bright-line rules as to their likely impact on the voluntariness of a confession.

The impact of false evidence ploys, if any, must instead be assessed in light of the totality of the circumstances, including the presence or absence of other coercive circumstances and the personal characteristics of the defendant. See, e.g., *United States* v. *Byram*, 145 F.3d 405, 408 (1st Cir. 1998) (noting that certain lies can be coercive depending on type of lie and circumstances); *State* v. *Lawrence*, supra, 282 Conn. 176 ("[i]t is well established . . . that although some types of police trickery can entail coercion . . . trickery is not automatically coercion" (internal quotation marks omitted)); *People* v. *Thomas*, 22 N.Y.3d 629, 642, 8 N.E.3d 308, 985 N.Y.S.2d 193 (2014) ("It is well established that not all deception of a suspect is coercive, but in extreme forms it may be. Whether deception or other psychologically directed stratagems actually eclipse individual will, will of course depend [on] the facts of each case, both as they bear [on] the means employed and the vulnerability of the declarant.").

In the present case, we agree with the trial court that, in light of the totality of the circumstances, the officers' false evidence ploys did not cause the defendant's will to be overborne. Most of the false evidence claims—particularly the claims about the identifying witnesses and fingerprint evidence—were made during the first hour of the interview and were not particularly egregious. The defendant demonstrated that he was perfectly capable of pushing back on these claims. He told Natale that he "want[ed] to meet these people" who had supposedly identified him and that "there ain't none of my fingerprints" on the shell casings. At one point, the defendant indicated, "I guess I'll take [the case] to

trial then," and that he wanted to "see how it play[s] out. Hope for the best, pray for the wors[t]."

Most telling, one hour into the interview, the defendant falsely accused Quan Bezzle of committing the murder, even pretending to cry in order to make his story seem more believable. The defendant maintained this fabricated story for two more hours, despite the officers' continued emphasis on the false evidence. This type of resistant conduct is strong evidence that the defendant's will to resist was not subverted by his interrogators' ploys. See, e.g., *State* v. *Correa*, supra, 241 Conn. 337 ("If the defendant's will was overborne, it is highly unlikely that he would have signed a statement in which he accused another individual of being the killer. The defendant's consistent claims that he had not been involved in the crimes provide strong evidence that his will was not overborne by any police tactics.").

Second, the defendant contends that Natale and Zaweski repeatedly exaggerated the consequences if the defendant did not confess. The defendant relies on the repeated instances in which the officers told the defendant that he could be sentenced to sixty-five years imprisonment or spend the rest of his life in jail. Our review of the video recording of the interrogation discloses at least seven such statements. Further, approximately two and one-half hours into the interview, Natale had the following exchange with the defendant while confronting him with the implausibility of his claims of innocence:

"Natale: . . . Do you see all the . . . little things that are gonna go in the report, that are just gonna?

"[The Defendant]: I ain't do nothing.

"Natale: Fry you? They're gonna put you in the chair. You gotta at least admit that that story's crazy. Whether it's true or not, doesn't it sound silly?"

We disagree that these statements rendered the defendant's confession involuntary. The officers' statements that he was facing sixty-five years in prison were not impermissible because his potential exposure far exceeded that. Indeed, the trial court ultimately imposed a total effective sentence of ninety years imprisonment without the possibility of release, consisting of sixty years for murder, twenty years for conspiracy to commit robbery in the first degree, and ten years for criminal possession of a firearm, all running consecutively. Accordingly, we cannot conclude that the officers' statements regarding the defendant's potential exposure were unduly coercive because they were an accurate representation of the severity of the consequences that the defendant was facing. See, e.g., *United States* v. *Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (concluding that police's statement to defendant that his "children would be driving by the time he would be released from prison" was "an accurate [representa-

tion] of [the defendant's] predicament" and, therefore, "not unduly coercive" (internal quotation marks omitted)); *United States* v. *Nash*, 910 F.2d 749, 753 (11th Cir. 1990) ("telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth [are] no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government" (internal quotation marks omitted)).

We also agree with the trial court that Natale's apparent reference to the death penalty did not cause the defendant's will to be overborne. Although we view this statement as inappropriate, as the trial court found, the comment was a single, isolated statement made approximately two and one-half hours into the interrogation. It was never referenced again, and Zaweski quickly changed the subject to more mundane details about the defendant's mode of transportation on the night of the murder. The defendant had no audible reaction to the comment and continued his attempts to pin the murder on Quan Bezzle well after the statement was made.

Third, the defendant contends that Natale made impermissible threats that the defendant's family would be arrested if he did not confess. Specifically, Natale said that, although she "probably ha[d] no say in this," "they're probably gonna do warrants for them. Especially [because] you haven't shed any light on what's been going on with this." We agree with the trial court that the coercive impact of this statement is somewhat diminished in light of the fact that it was the defendant who had previously brought up the potential of his family's criminal exposure for the rifle, thereby indicating that he already was aware of the issue prior to Natale's comment. At the very least, however, Natale's comment apparently was intended to exploit and play on the defendant's previously expressed concern. We therefore do not condone it and acknowledge that such tactics can provide a basis for concluding that a confession is involuntary.

Ultimately, however, we agree with the trial court that this single comment was not causally related to the defendant's confession. As the trial court found, the defendant "responded dispassionately" and appeared to have "brushed off" Natale's comment, which "suggests that he recognized [it] as an empty and vacuous ploy." Further, Natale made the comment very early in the interrogation, and the defendant denied his involvement and blamed Quan Bezzle for more than two hours after this comment was made. See, e.g., *State* v. *Correa*, supra, 241 Conn. 338 (rejecting claim that police statements about immigration status of defendant's family and purported contract on defendant's life overcame his will when "[t]he defendant reacted calmly when these statements were made and exhibited no signs of

duress," and "[i]t was several hours later before the defendant himself initiated a statement seeking to exculpate himself and to inculpate [a third party]").

Finally, the defendant contends that the officers engaged in impermissible minimization and suggested that he would receive leniency in exchange for confessing. The video recording and transcript reveal that Natale and Zaweski made a number of such statements throughout the interview. At one point, Natale told the defendant that he would inevitably be charged with some form of murder, and that "the only difference . . . depending on our conversation today . . . is felony murder or being in the wrong place at the wrong time murder. You could either be the shooter, or the person [who] sits there and doesn't know what the fuck was going on, and was just in the wrong place at the wrong time. . . . You potentially don't have a chance to go home for sixty-five years, depending on how the outcome of today goes between me and you . . . ."

On another occasion, Natale said, "you could get yourself out of this mess . . . if you tell the truth . . . ." Later in the interview, Zaweski said: "[I]f you wanna spend the rest of your life in prison and sit there and keep your mouth shut, that's fine. But if you wanna salvage some years later on or explain to people, explain to your mom, that this isn't who you really are. It was an accident. You made a mistake. This is the time you have to do that."

Lastly, just before the defendant confessed to shooting the victim, Natale said: "The choice is yours. Murder, manslaughter. . . . Right now, you're looking at murder, felony murder. Just [because] you're being a knucklehead and not coming to grips that you're fucked if you continue to stick with this story." The defendant responded by asking, "[s]o, how much time do I get for manslaughter?" Natale responded: "I wouldn't be worried about time right now. I'd be worrying about . . . what your end result story's gonna be. . . . You have to worry about telling the truth right now and coming clean." The defendant then said, "[a]lright, I'll tell the truth," and confessed to having shot the victim, though he claimed he did so accidentally.

This court previously has explained: "[When] [t]he defendant was given no specific assurances that giving a statement would affect the outcome of the criminal proceedings . . . [e]ncouraging a suspect to tell the truth . . . does not, as a matter of law, overcome a confessor's will . . . . Neither is a statement that the accused's cooperation will be made known to the court sufficient inducement so as to render a subsequent incriminating statement involuntary. . . . Several courts have held that remarks of the police far more explicitly indicating a defendant's willingness to make a statement would be viewed favorably do not render his confession involuntary. . . . [A] statement [that the

accused's cooperation would be to his benefit] by a law enforcement officer falls *far* short of creating the compelling pressures which work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Pinder*, supra, 250 Conn. 424.

Although Natale's comments purported to encourage the defendant to "tell the truth" and even suggested that he could be charged with the lesser crime of manslaughter depending on the statement he gave, neither Natale or Zaweski ever definitively promised the defendant that he would be charged only with manslaughter if he confessed, or that he would receive a lesser sentence for doing so. Nor did the officers ever represent that they had the authority to determine the offense he was charged with, or that the penalties that attach to manslaughter were not severe. Such vague, predictive suggestions that a confession could potentially benefit the defendant or cause a fact finder to view him more favorably are not inherently coercive.[24] See, e.g., *United States* v. *Jackson*, 608 F.3d 100, 103 (1st Cir.) ("a suggestion that cooperation might induce leniency" does not amount to coercion), cert. denied, 562 U.S. 990, 131 S. Ct. 435, 178 L. Ed. 2d 337 (2010); *Commonwealth* v. *O'Brian*, 445 Mass. 720, 725, 727, 840 N.E.2d 500 (detective's comment that shooting could have been accident did not render defendant's confession involuntary under totality of circumstances, and detective's comment that he would bring defendant's cooperation to prosecutor's attention and that defendant " 'may see the light of day down the road' " did not "coerce the defendant into confessing because the detective did not promise a lesser sentence and did not hold himself out as possessing the authority to enter into a plea with, or reduce the charges for, the defendant"), cert. denied, 549 U.S. 898, 127 S. Ct. 213, 166 L. Ed. 2d 171 (2006).[25]

Additional circumstances of the interrogation lead us to conclude that the officers' tactics, even when considered in combination with each other, did not cause the defendant's will to be overborne. The length of the interrogation that led to his confession—approximately three hours—is far shorter than other interrogations held not to have been inherently coercive. See, e.g., *State* v. *DeAngelis*, 200 Conn. 224, 233, 235, 511 A.2d 310 (1986) (ten and one-half hour interview did not necessarily mean that defendant's admissions were involuntary); *State* v. *Carter*, 189 Conn. 631, 637–38, 458 A.2d 379 (1983) (eight hour detention and interview, "though substantial in duration, does not remotely approach the length of those interrogations held to be so objectionable on that ground . . . as to warrant reversal of a finding by a trial court that a confession was voluntary"); see also, e.g., *Berghuis* v. *Thompkins*, 560 U.S. 370, 387, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) ("there is no authority for the proposition that

an interrogation [that lasted three hours] is inherently coercive"). There also were three three to ten minute periods, approximately every hour, when either one or both of the officers left the room and the questioning ceased.

Additionally, during the interrogation, Natale and Zaweski never subjected the defendant to actual physical abuse or threats of such abuse. Although their tones ranged from conversational to accusatory throughout the interrogation, they both remained seated at all times. They never invaded the defendant's personal space, displayed their weapons or engaged in any other acts of intimidation. Nor did the defendant ever ask for a break or for the questioning to cease for any reason, make any suggestion that he wanted to invoke his right to silence, or ask for an attorney.

The video recording also provides evidence that the tactics of the interrogators did not affect the demeanor of the defendant, who was familiar with the criminal justice system. The trial court found in relevant part: "[Although] the police were at some points contentious in their questioning, at no point did the defendant's demeanor appear to change in response to the aggressive nature of the questioning. The defendant remained largely calm and low-key throughout the interview. He characterized himself, generally, as a 'calm' person. . . . The defendant appeared at ease contesting the accusations being made by the police during the interview . . . . He had no difficultly jousting with his interrogators."

The concurrence and dissent asserts that "[t]his view conforms to case law that implicitly assumes that a person's external demeanor provides a reliable indication of his or her internal emotional state during an interrogation, and, thus, a calm demeanor suggests the absence of coercion. This unexamined assumption strikes me as dubious at best. We now know that a subject's external appearance may not accurately reflect his or her internal reality." Footnote 21 of the concurring and dissenting opinion. The concurrence and dissent relies on law review articles and studies that are not in the record to argue that the trial court was not situated "to know what psychological, emotional, and cultural factors actually lay behind this defendant's calm demeanor." Id.

It is undisputed, however, that "[a] defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary." *United States* v. *Jacques*, 744 F.3d 804, 809 (1st Cir.), cert. denied, 574 U.S. 853, 135 S. Ct. 131, 190 L. Ed. 2d 100 (2014). The concurrence and dissent seems to assert that a fact finder cannot make inferences from the demeanor of a witness, which is contrary to the well established principle that "[a]n appellate court must defer to the trier of fact's assessment of credibility because [i]t is

the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; [thus, the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 155. Accordingly, although we are mindful that sometimes one's demeanor can be impacted by psychological, social and cultural factors, that does not mean that one's demeanor cannot be considered at all by a fact finder. Demeanor can be considered as *a factor* in assessing the totality of the circumstances. The inferences drawn from one's demeanor may vary depending on the individual witness or party and the particular circumstances of the case. In this case, we cannot conclude that the trial court erred in making the inference that the defendant's calm demeanor was one factor demonstrating that the defendant's will was not overborne by police tactics.

Perhaps more fundamental, the concurrence and dissent's bald assertion that the defendant's calm and low-key demeanor is consistent with "a substantial body of literature indicating that it is not uncommon for individuals growing up in a violent home or neighborhood, as the defendant in the present case did, to adopt a mask of unemotional fearlessness as a coping mechanism"; footnote 21 of the concurring and dissenting opinion; is belied by the very facts of this interview. The concurrence and dissent explains that the masking behavior is used as a way to show bravado and to avoid vulnerability. See id. But the defendant did just the opposite for a large part of the interview.

If the defendant was ever one of those mask wearing individuals of which the concurrence and dissent speaks, he certainly had no problem shedding that mask when he tried to show fear and vulnerability as he told the Quan Bezzle lie during the interview. He went as far as pretending to cry and telling the officers that he was afraid of Quan Bezzle. The concurrence and dissent does not acknowledge that this defendant either does not fit the concurrence and dissent's picture of someone who wears a "mask of unemotional fearlessness"; id.; or that, even if he did at some point, he shed the so-called mask when he cried and proclaimed fear of Quan Bezzle. By doing so, the concurrence and dissent shows its hand—it does not consider this particular defendant, as is required, and, instead, focuses on the potential, theoretical impact of police tactics on a generalized group of defendants.

Indeed, the defendant's tears and his expression of fear of Quan Bezzle strongly weigh against the concurrence and dissent's theory that this defendant's calm and low-key demeanor was just a coping mechanism. Instead, the defendant's ability to feign an emotional outburst and then return to his calm and low-key

demeanor demonstrates that he was in total control of his emotions during the interrogation. Whatever the merit of the concurrence and dissent's tangential argument about what some "individuals [who grow] up in a violent home or neighborhood";[26] id.; do to mask their emotions, this defendant certainly did not fit that paradigm in the police interview at issue in this case.[27]

Thus, although the concurrence and dissent packages its position as trying to appreciate the plight of individuals who grow up in a violent home or neighborhood, by painting with such a broad brush, the concurrence and dissent's position perpetuates gross overgeneralizations, instead of looking at the individual characteristics of this particular defendant, an individual who freely showed some emotion and fear during the police interview.

Indeed, the record also does not support the defendant's claim that his personal characteristics rendered him especially susceptible to coercion. The defendant was twenty-one years old at the time of his interview. He was gainfully employed full-time as a chef at Chipotle, was in the process of obtaining his GED, and planned to pursue college degrees in culinary arts and business management. There was no evidence presented, either at the suppression hearing or at trial, to suggest that the defendant was not of normal intelligence.[28] Such characteristics, coupled with the valid *Miranda* warnings twice provided and waived by him prior to any questioning, provide strong support for a finding of voluntariness. See, e.g., *State* v. *Ramos*, 317 Conn. 19, 32–33, 114 A.3d 1202 (2015) (Confession was voluntary when "[t]he defendant was forty-three years old at the time of his confession. He had obtained his [GED] certificate, was able to read, and was twice read his *Miranda* rights by [the police]. The defendant appeared calm and cooperative throughout his interview. Once he received his *Miranda* warnings, he stated repeatedly that he understood his rights and the implications of waiving them."); *State* v. *Pinder*, supra, 250 Conn. 425 (rejecting argument that defendant was "susceptible to coercion by the police" when defendant "was twenty years old, apparently had completed high school," "was gainfully employed as a car salesman," and expert witness testified that defendant "was of normal intelligence").

As we noted previously in this opinion, the defendant was not a novice to the criminal justice system. He had multiple prior felony convictions and, at the time of his interrogation, had only recently been released from serving a two and one-half year sentence of incarceration. This prior experience suggests not only that the defendant was well equipped to retain his "capacity for self-determination"; (internal quotation marks omitted) *State* v. *Andrews*, supra, 313 Conn. 321; in the face of coercive or deceptive police tactics, but also that he

fully understood the nature of his *Miranda* rights and the consequences of waiving (or never invoking) them. Compare *State* v. *Madera*, 210 Conn. 22, 45, 554 A.2d 263 (1989) (defendant's "prior exposure to the criminal justice system, due to some seventeen prior arrests," was relevant to "his knowledge of his [*Miranda*] rights," as well as to whether interrogation tactics had overborne his will), with *People* v. *Thomas*, supra, 22 N.Y.3d 642 (coercive interrogation tactics "were manifestly lethal to self-determination when deployed against [the] defendant, an unsophisticated individual without experience in the criminal justice system").

We also disagree that the record supports the defendant's claim that he was rendered especially susceptible to coercion due to lack of sleep. It is well settled that "tiredness, or even exhaustion, does not compel the conclusion that [the defendant's] will was overborne or [his] capacity for self-determination critically impaired." (Internal quotation marks omitted.) *United States* v. *Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016), cert. denied, U.S. , 137 S. Ct. 1597, 197 L. Ed. 2d 723 (2017); see, e.g., *State* v. *Pinder*, supra, 250 Conn. 425 (fact that defendant had mental deficiency or was upset emotionally "[does not] necessarily render his statements inadmissible" (internal quotation marks omitted)).

Moreover, the trial court specifically found, on the basis of its review of the video recording of the interrogation, that the defendant did not "[suffer] from a lack of mental acuity or physical infirmity as a result of a lack of sleep . . . ." Such a factual finding defeats the defendant's claim that his lack of sleep contributed to the involuntariness of his confession because "[a] diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." (Internal quotation marks omitted.) *United States* v. *Salameh*, 152 F.3d 88, 117 (2d Cir. 1998), cert. denied sub nom. *Abouhalima* v. *United States*, 525 U.S. 1112, 119 S. Ct. 885, 142 L. Ed. 2d 785 (1999), and cert. denied, 526 U.S. 1028, 119 S. Ct. 1273, 143 L. Ed. 2d 368 (1999), and cert. denied sub nom. *Ayyad* v. *United States*, 526 U.S. 1028, 119 S. Ct. 1274, 143 L. Ed. 2d 368 (1999), and cert. denied sub nom. *Ajaj* v. *United States*, 526 U.S. 1044, 119 S. Ct. 1345, 143 L. Ed. 2d 508 (1999); see, e.g., *United States* v. *Calvetti*, supra, 836 F.3d 664 (defendant's claim that she was tired did not render her statements involuntary when "nothing in the record suggest[ed] she was vulnerable as a result").

After a review of the video recording, we conclude that the trial court's finding was reasonable and, thus, not clearly erroneous. Although the defendant showed signs of being tired during the interview and appeared to begin to doze off whenever the officers would leave the interrogation room, the defendant's performance during the interrogation supports the trial court's find-

ing that such a condition did not diminish his ability to resist. As the trial court found, the defendant was lucid and responsive throughout the interview, was able to understand the officers' questions, and communicated clearly and coherently. In addition, the defendant had the wherewithal to push back at the officers' interrogation tactics, consistently denying his involvement in the shooting, concocting the lie that Quan Bezzle committed the murder and maintaining that lie for multiple hours, and even pretending to cry to give credibility to his story. This was not delirium; by the defendant's own admission, it was calculated. These facts undercut any claim that the defendant's lack of sleep diminished his ability to resist. See, e.g., *State* v. *DeAngelis*, supra, 200 Conn. 234 ("[the officer] was aware that the defendant had said that he had not slept the night before, but he testified [that] the defendant appeared fresh and alert throughout the questioning"); *State* v. *Carter*, supra, 189 Conn. 638 ("despite some sleepiness observed near the end of the conversation with the police, [the defendant] was alert and responsive").

In sum, the totality of the circumstances convinces us that "the defendant did not confess because his will . . . was overborne, but rather that he confessed of his own free will because he believed it would be in his best interest to do so." *State* v. *James*, 237 Conn. 390, 428, 678 A.2d 1338 (1996). Accordingly, we conclude that the state proved the voluntariness of the defendant's statements by a preponderance of the evidence and that their admission at trial did not violate the due process clause of the federal constitution.

B

Finally, the defendant contends that, even if his confession is voluntary under the federal constitution, we should "set a higher standard under [our] state case law." Specifically, the defendant asks us to "create a prophylactic constitutional rule requiring trial courts to strongly consider whether [the coercive tactics used in this case] raise questions about the voluntariness of a confession." The defendant relies on the settled proposition that "the federal constitution sets the floor, not the ceiling, on individual rights"; *State* v. *Purcell*, 331 Conn. 318, 341, 203 A.3d 542 (2019); and contends that such a step is warranted in light of the multifactor test set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

"In construing the Connecticut constitution to determine whether it provides our citizens with greater protections than the federal constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, supra, 222 Conn. 684–85]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the

intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]." (Internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 29, 50, 225 A.3d 668 (2020).

We conclude that a review of the *Geisler* factors does not support the defendant's claim that we should adopt a prophylactic constitutional rule requiring trial courts to strongly consider whether coercive tactics raise questions about the voluntariness of a confession. First, the text of the state due process clause does not support the defendant's claim. See, e.g., *State* v. *Lockhart*, 298 Conn. 537, 551–52, 4 A.3d 1176 (2010) (concluding that similarity between text of federal and state due process clauses supports "a common interpretation of the provisions" (internal quotation marks omitted)); see also footnotes 7 and 8 of this opinion. Second, the defendant fails to point to any Connecticut authority in support of his claim that the state constitutional due process clause requires a more stringent analysis regarding the admission of confessions. To the contrary, this court has declined to require a higher burden for the admission of confessions under the state constitution than the federal constitution. See, e.g., *State* v. *Lockhart*, supra, 543–44 (declining to require recording of confessions as constitutional requirement or under court's supervisory authority). Third, the defendant fails to cite to any federal precedent to support his claim. Fourth, the only case from a sister state cited by the defendant is *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 436–40, 813 N.E.2d 516 (2004). We find that case unpersuasive because Massachusetts law requires the state to prove the voluntariness of a confession beyond a reasonable doubt; see, e.g., id., 439, 441, 448; and this court has rejected such a requirement. See, e.g., *State* v. *James*, supra, 237 Conn. 412–26 (declining to require state to prove voluntariness of confession beyond reasonable doubt). Fifth, the defendant does not point to any evidence that the authors of our state constitution intended to provide greater protection against involuntary confessions. See *State* v. *Lockhart*, supra, 556.

Furthermore, public policy also does not support adopting the prophylactic rule requested by the defendant. Trial courts are already required to "strongly consider" the coercive nature of an interrogation in determining whether, under the totality of the circumstances, a defendant's statements have been obtained involuntarily. We trust that our trial courts are perfectly capable of taking into account any available social science in assessing whether particular interrogation tactics combined to overbear a defendant's will, to the extent they deem it appropriate.

Moreover, defendants are capable of vindicating such concerns by introducing, at the suppression hearing or at trial, social science evidence or expert testimony that

they believe bears on the likelihood that an interrogation overbore a defendant's will. Defendants may also obtain appropriate jury instructions regarding the likelihood that particular interrogation tactics render a confession unreliable.[29] Accordingly, we decline to adopt a prophylactic rule at this time.

We reiterate that all of the circumstances of an interrogation must be taken into account in determining whether a confession is voluntary. Nevertheless, there are limits and boundaries that the police should not cross when conducting an interrogation. We find some of the tactics in the present case close to that line, and, in certain circumstances, those tactics could very well produce involuntary confessions. In light of these concerns, law enforcement would be ill-advised to read today's decision as condoning the use of all of the tactics employed in this case.

For the foregoing reasons, we conclude that the defendant's statements were voluntary and that the trial court properly admitted them into evidence at trial.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, D'AURIA and KAHN, Js., concurred.

* July 22, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The jury also found the defendant guilty of felony murder in violation of General Statutes § 53a-54c. The trial court subsequently vacated the felony murder conviction pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013).

[2] Hereinafter, all references to § 53a-217 in this opinion are to the 2013 revision of the statute, as amended by P.A. 13-3.

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] The first paragraph of the affidavit introduced the police officers' conducting the investigation, the second paragraph described the officers' training and experience, and the sixth paragraph averred that the information in the prior paragraphs established probable cause to believe that the defendant was storing a firearm at 374 Peck Street in violation of § 53a-217.

[5] Because the present case fits neatly within the contours of the independent source doctrine, we do not address the closely related inevitable discovery doctrine. See, e.g., *State* v. *Cobb*, 251 Conn. 285, 337–38, 743 A.2d 1 (1999) (discussing relationship between independent source and inevitable discovery doctrines), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

[6] The only information in Podsiad's affidavit potentially tainted by the allegedly unlawful initial entry is the statement in paragraph 5 that "[t]he New Haven Police Department SWAT team made entry into 374 Peck [Street] and secured the residents. Inside the residence was [the defendant] . . . ." We therefore consider the adequacy of Podsiad's affidavit "shorn . . . of that information." *State* v. *Cobb*, supra, 251 Conn. 334.

[7] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[8] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[9] This court explained in *State* v. *Flores*, supra, 319 Conn. 218, that "[t]hree of the most common factors used to evaluate the reliability of an informant's

tip are (1) corroboration of the information by [the] police, (2) declarations against penal interest by the informant-declarant, and (3) the reputation and past criminal behavior of the suspect." (Internal quotation marks omitted.) Id., 226.

[10] We recognize, as the defendant points out, that, in *State* v. *DeFusco*, 224 Conn. 627, 620 A.2d 746 (1993), this court explained that "[t]he affiants' assertion that the informant was reliable does not itself give the issuing judge a basis [on] which to infer reliability." Id., 643. Nevertheless, this court further explained that an affiant's statement that an informant had been used in the past does give an issuing judge a basis to infer reliability. Id. The difference between these two types of statements is well recognized. "[A]n assertion that the informant is reliable leaves totally undisclosed the basis on which that judgment was made, while an assertion that . . . his past information was reliable at least indicates that the judgment is based [on] the informant's past performance." 2 W. LaFave, Search and Seizure (5th Ed. 2012) § 3.3 (b), p. 152. Because the affidavit in the present case contained a statement that information provided by the informant in the past had proved reliable, the affidavit provided a basis for the issuing judge to infer reliability.

[11] The defendant asserts that the corroboration of the caliber of the firearm used in the shooting is of little significance because "[nine millimeter] is one of the most common ammunition types and appears in many Connecticut homicide cases." This court has questioned whether corroboration of "mundane facts" is entitled to weight in the probable cause analysis. See, e.g., *State* v. *DeFusco*, supra, 224 Conn. 645 n.24 ("we question whether verified information regarding such mundane facts as the defendant's address and the model of his cars, taken by itself, may properly be found to establish the reliability of an informant"). The defendant, however, introduced no evidence at the suppression hearing regarding the prevalence of firearms that fire nine millimeter ammunition. Therefore, we have no basis on which to question the issuing judge's reliance on the informant's corroboration of the caliber of the firearm used in the crimes.

[12] See *State* v. *Ashby*, 336 Conn. 452, 468, 247 A.3d 521 (2020) (Appellate review of the trial court's resolution of a constitutional claim "is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." (Internal quotation marks omitted.)).

[13] The defendant noted at one point during his interrogation that he "just came home six months ago." Presumably, this was a reference to the thirty month sentence he had served.

[14] The defendant does not challenge the voluntariness of this admission.

[15] The only evidence that the defendant had not slept came from his own testimony at trial. The state contends that we cannot rely on this testimony when assessing the voluntariness of the defendant's confession on appeal because it "is self-serving, uncorroborated, and disputed by the state." Because, however, the state has not identified any evidence that contravenes this aspect of the defendant's testimony, we assume for purposes of our analysis that the defendant did not sleep between when he was transported to the police station and when his interview began.

[16] The defendant has never contested the adequacy of the *Miranda* warnings provided to him at the start of the interview or earlier that morning while he was detained in the cruiser. Nor has the defendant ever claimed that he did not knowingly and voluntarily waive his rights on either occasion.

[17] Natale also confronted the defendant with actual evidence. She repeatedly referenced the defendant's having recently been "yapping [his] mouth" and "bragging" about his involvement in the homicide, an apparent reference to the confidential informant's telling Podsiad that the defendant had admitted his involvement in the homicide. See part I of this opinion. Natale also pointed out that the assault rifle found in his attic was the same type of firearm used in the shooting and that it could be tested to see whether it matched the shell casings found at the scene.

[18] At one point, the defendant claimed that he retrieved his bicycle from CVS Pharmacy. At another point, he said that he retrieved his bicycle from Walgreens.

[19] Wright subsequently did provide a statement to the police in which she implicated the defendant.

[20] At trial, the defendant testified that he had interpreted this statement as suggesting that he would receive the death penalty, specifically, the electric chair, if he did not confess. The defendant testified that he believed

that such a sentence would have been possible if he were convicted.

[21] This approach is consistent with that taken by the federal courts of appeals and many of our sister state courts. See, e.g., *United States* v. *McNeal*, 862 F.3d 1057, 1061–62 (10th Cir. 2017); *United States* v. *Murphy*, 703 F.3d 182, 188–89 (2d Cir. 2012); *United States* v. *Prokupek*, 632 F.3d 460, 462–63 (8th Cir. 2011); *Muniz* v. *Rovira-Martino*, 453 F.3d 10, 13 (1st Cir. 2006); *United States* v. *Navarro-Camacho*, 186 F.3d 701, 707–708 (6th Cir. 1999); *Robinson* v. *State*, 5 N.E.3d 362, 365–66 (Ind. 2014); *State* v. *Williams*, 334 S.W.3d 177, 180–82 (Mo. App. 2011); *State* v. *Elders*, 192 N.J. 224, 244–45, 927 A.2d 1250 (2007); *Montanez* v. *State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). But see, e.g., *People* v. *Hughes*, 3 N.E.3d 297, 312–13 (Ill. App. 2013), rev'd in part on other grounds, 69 N.E.3d 791 (Ill. 2015); *Commonwealth* v. *Novo*, 442 Mass. 262, 266, 812 N.E.2d 1169 (2004); *State* v. *Binette*, 33 S.W.3d 215, 217 (Tenn. 2000).

[22] The concurrence and dissent purports to "begin with a more complete picture of the method employed in the defendant's interrogation . . . ." Part I of the concurring and dissenting opinion. Nevertheless, it is undisputed that, in determining whether a defendant's will was overborne, we are required to look at the totality of the circumstances, not just the behavior of the police. The concurrence and dissent makes no mention whatsoever of the multiple lies told by the defendant during the first three hours of the interrogation and, as a result, fails to address how the defendant's lies and his capacity to come up with them inform the question of whether his will was overcome by the officers.

Those are not the only facts that the concurrence and dissent neglects to present or address. There is also virtually no analysis of this defendant's personal characteristics (other than his race, which we will address separately), namely, his age at the time of the interrogation (twenty-one), education, or his experience with criminal proceedings, all of which are relevant to evaluating how the police tactics impacted this particular defendant. By leaving these facts out of the analysis and focusing nearly exclusively on the tactics used by the police, the concurrence and dissent ignores a necessary and crucial aspect of a proper analysis used to determine whether a defendant's will was overborne—to wit, the impact that the police tactics had on this defendant. See, e.g., *McCall* v. *Dutton*, 863 F.2d 454, 460 (6th Cir. 1988) (when police yelled and pointed guns at accused, court ruled that, because defendant was educated, remained calm, waived his *Miranda* rights and accused someone else of committing crime, "even if [the defendant] had proved police coercion, he would still not prevail because the alleged 'coercion' was simply insufficient to overbear the will of the [defendant]"), cert. denied, 490 U.S. 1020, 109 S. Ct. 1744, 104 L. Ed. 2d 181 (1989).

Instead, the concurrence and dissent intimates that the mere use of these tactics at any point in the interrogation is sufficient to conclude that the defendant's will was overborne by them. This is not sufficient. Instead, it must be shown "that his will was overborne *because* of the coercive police activity in question. If the police misconduct at issue was not the 'crucial motivating factor' behind [the defendant's] decision to confess, the confession may not be suppressed." (Emphasis in original.) Id., 459. We understand the concurrence and dissent's palpable disdain for the police tactics used in this case; some of those tactics we also question. The flaw in the concurrence and dissent's position, however, is the sole focus on the police tactics to the exclusion of the other circumstances of the interview and the characteristics of this defendant.

[23] Natale and Zaweski employed a series of interrogation tactics from the Reid Technique. The Reid Technique is a method of interrogation pioneered by John E. Reid and Associates. The concurrence and dissent spends a great deal of time discussing and criticizing the Reid Technique. The concurrence and dissent cites to scholarly criticisms of this technique; see part I B of the concurring and dissenting opinion; while also acknowledging that the technique, in and of itself, is not illegal. See part II of the concurring and dissenting opinion. We are unaware of any federal cases, addressing voluntariness under the fourth amendment, that have deemed the Reid Technique illegal or impermissible to employ. We do, however, agree with the observations of the United States District Court for the District of Rhode Island, which noted that there is valid criticism of the technique; see *United States* v. *Monroe*, 264 F. Supp. 3d 376, 392–94 (D.R.I. 2017); and that "it is not difficult to imagine circumstances [in which], depending on how the Reid Technique is employed or misemployed on a juvenile or an individual with an intellectual disability, the tactics would have an impermissible, coercive effect." Id., 393 n.153. The defendant here falls into neither of those vulnera-

ble categories, and we reject the concurrence and dissent's attempt to treat black males, including the defendant here, as if they either fall into one of these categories or should be treated as if they do.

Furthermore, the concurrence and dissent cites to *State* v. *Baker*, 147 Haw. 413, 433–35, 465 P.3d 860 (2020), as an example of a court that found that police use of multiple coercive interrogation techniques in conjunction with each other rendered the defendant's statement involuntary. See part I B of the concurring and dissenting opinion. Despite its reliance on some federal case law, the Hawaii Supreme Court also relied on its state specific case law; see *State* v. *Baker*, supra, 433–35; and, more importantly, concluded that the admission of the defendant's statement violated his *state* constitutional rights. See id., 435 ("the admission of the statement at trial violated [the defendant's] right against self-incrimination under [article one, § 10, of the Hawaii] [c]onstitution").

[24] The concurrence and dissent focuses on the following statement by Natale: "The choice is yours. Murder, manslaughter. That's your choice." The concurrence and dissent asserts that the statement "was not simply a case in which the interrogators falsely indicated that the defendant's confession to an accidental shooting would result in a manslaughter charge, when the choice of charges actually would be a matter left entirely to the prosecutor's discretion (i.e., misrepresentation of fact). Rather, the interrogators affirmatively misled the defendant by telling him that the accident/self-defense narrative proposed to him was relevant and material to his criminal exposure for felony murder, which was untrue as a matter of law." (Emphasis omitted.) Footnote 18 of the concurring and dissenting opinion. This is clearly a stretch. It strains credulity to think that the officers were telling the defendant that he could decide which charges to levy against himself as opposed to telling him that it was his choice whether to tell the truth. Of course, the defendant himself, who had significant, prior experience with the criminal justice system and also testified in this case, never alleged that he interpreted the officers' comments in this way. Furthermore, although the prosecutors could still charge the defendant with felony murder, even if the defendant claimed that the shooting was accidental or in self-defense, the prosecutors could consider that factor when choosing whether to charge the defendant with felony murder.

[25] The concurrence and dissent asserts that Natale's "implied promise that the defendant's confession could result in only a manslaughter charge . . . plainly was the tipping point for the defendant . . . ." Part II of the concurring and dissenting opinion. We disagree with the concurrence and dissent's conclusion that this comment "plainly was the tipping point . . . ." Id. Instead, we focus on how all of these tactics affected this particular defendant and his will to resist based on the totality of the circumstances. See *Dickerson* v. *United States*, supra, 530 U.S. 434 (totality of circumstances test "depend[s] [on] a weighing of the circumstances of pressure against the power of resistance of the person confessing" (internal quotation marks omitted)).

[26] Although the concurrence and dissent connects this phenomenon of masking with growing up in violent homes or neighborhoods, the majority of the sources on which the concurrence and dissent relies appear to connect this phenomenon to race and gender—particularly black males. We reject the concurrence and dissent's invitation to apply these race and gender based overgeneralizations to this particular defendant. Instead, we choose to believe the defendant, who not only cried during the interview, but also described himself as, generally, a calm person. Presumably, the defendant knows himself best, notwithstanding the concurrence and dissent's generalizations about males, particularly black males. To be clear, this defendant never claimed at any point in this case—not at the suppression hearing, in his testimony at trial, at the sentencing hearing, in his appellate brief or at oral argument before this court—that he wore a mask of unemotional fearlessness. See footnote 21 of the concurring and dissenting opinion.

[27] The concurrence and dissent asserts that "one of the officers said to the defendant, well into the interrogation, 'I think you're putting a tough guy front on' . . . ." Footnote 21 of the concurring and dissenting opinion. A review of the following colloquy between the defendant and Natale reveals that Natale's comment related to a conversation about whether the defendant had been sleeping:

"Natale: I bet you haven't even slept all week, have you?

"[The Defendant]: Yeah.

"Natale: You have?

"[The Defendant]: I slept.

"Natale: You slept good, after being involved in a murder?

"[The Defendant]: [No response heard].

"Natale: I don't think you have. I think you're putting a tough guy front on.

"[The Defendant]: No, I did. I slept good."

Based on the foregoing, contrary to the concurrence and dissent, we would not conclude that this one comment related to whether the defendant was sleeping, made in the course of an approximately three hour interview, means that the record in the present case supports the concurrence and dissent's hypothesis that the defendant's calm, low-key demeanor was the result of "a mask of unemotional fearlessness" when we consider the entire interview, as we are required to do.

[28] The defendant and the concurrence and dissent rely on a psychological evaluation report that the defendant submitted to the court at his sentencing hearing as support for his claim that he was susceptible to coercion. See footnote 20 of the concurring and dissenting opinion. This was not the presentence investigation report but, instead, a report from a psychologist hired by the defendant. The report states that cognitive tests revealed that the defendant had a low average intelligence quotient (IQ) of between 80 and 85, had "mild intellectual impairments," and had a "tendency to cede to authority or to social pressure." The state contends that this court cannot consider the assertions in this report in determining whether the defendant's statements were voluntary because the report was submitted at the defendant's sentencing hearing rather than at trial or at the suppression hearing. It is by now well settled that, "in order to determine whether the defendant's constitutional rights have been infringed, [w]e review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress." (Internal quotation marks omitted.) *State* v. *Edwards*, 299 Conn. 419, 439 n.16, 11 A.3d 116 (2011). However, at the sentencing hearing, the trial court concluded that "[the defendant's] conduct during this crime and the aftermath of the crime, in the court's view, clearly contradicts and undermines [the psychologist's] statements that the defendant, in his words, was likely to be nonassertive and adapt socially to his surroundings. He certainly did not [cede] control to other people based on the court's view of the credible evidence that was presented." The sentencing court placed no temporal limitation on what it meant by the "aftermath of the crime," and it considered all of the evidence at the trial. As this court has explained, appellate review of the record in connection with a constitutional claim "must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state *but that the trial court did not expressly discredit.*" (Emphasis added.) *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016). Accordingly, because the trial court expressly rejected the psychologist's conclusion that the defendant was likely to be nonassertive, adapt socially to his surroundings and cede control to other people, we do not consider it on appeal in assessing the voluntariness of the defendant's statements. We can find no basis for the concurrence and dissent's reliance on allegations by the defendant that were rejected by the trial court at the sentencing hearing.

[29] We note that the defendant called such an expert witness, and obtained such an instruction, at trial in the present case. Specifically, the jury was instructed that it must consider the voluntariness of the statement and that "[t]he test of voluntariness is whether an examination of all the circumstances present surrounding the rendering of the statement shows that the conduct of the police was such as to overbear the defendant's will to resist and resulted in a statement that was not truly self-determined. . . . Whether the statement was coerced means considering . . . whether it was forced or compelled out of the defendant by abusive conduct, by promises, implied or direct, or by deceit or artifice by the police [that] overbore the defendant's will to resist and critically impair[ed] his capacity for self-determination and, thus, brought about a statement that was not freely self-determined."

─────────────────────────────